Julie Cavanaugh-Bill (NV Bar No. 11533)
Attorney & Counselor at Law
Cavanaugh-Bill Law Offices, LLC
Henderson Bank Building
401 Railroad Street, Suite 307
Elko, Nevada 89801
TEL: (775) 753-4357
FAX: (775) 753-4360
julie@cblawoffices.org
www.cblawoffices.org

John Buse (CA Bar No. 163156), *Application for Pro Hac Vice to be filed*
Lisa T. Belenky (CA Bar No. 203225), *Application for Pro Hac Vice to be filed*
CENTER FOR BIOLOGICAL DIVERSITY
351 California Street, Suite 600
San Francisco, CA 94104
Telephone: (415) 436-9682 x 307
Facsimile: (415) 436-9683
jbuse@biologicaldiversity.org
lbelenky@biologicaldiversity.org

*(will comply with LR IA 10-2 within 45 days)*

*Attorneys for Plaintiff*
*Additional Counsel Listed on Signature Page*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY )<br><br>      Plaintiff, )<br>                        )<br>      vs. )<br>                        )<br>U.S. FISH AND WILDLIFE SERVICE, and )<br>KEN SALAZAR, Secretary of the Interior, )<br>                        )<br>      Defendants. )<br>_____ ) | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Complaint for Declaratory and Injunctive Relief

# I. INTRODUCTION

1.      This is an action for declaratory and injunctive relief brought by Plaintiff Center for Biological Diversity ("the Center") raising claims under the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.* ("ESA"), NEPA, 42 U.S.C. §§ 4321 *et seq.*, the National Wildlife Refuge System Improvement Act, 16 U.S.C. §§ 668dd *et seq.,* and the property clause of the U.S. Constitution, U.S. Const. art. IV, § 3, cl. 2.

2.      Defendants have violated the property clause of the U.S. Constitution by relinquishing U.S. water rights expressly reserved for the Moapa Valley National Wildlife Refuge for the benefit of the endangered Moapa dace.  Further, Defendants have violated Section 7 of the ESA by failing to insure against jeopardy of extinction of the endangered Moapa dace, an endangered fish found only in southeastern Nevada.  The Defendants' decisions and actions including, but not limited to, approval of the Muddy River Memorandum of Agreement ("MOA") and issuance of the related Biological Opinion ("BO"), were arbitrary and capricious and should be set aside.  Plaintiff herein challenges the Defendants' approval of the Muddy River MOA and the issuance of the BO which will allow excessive groundwater pumping to begin that may jeopardize the survival of the Moapa dace in the wild in violation of the ESA.  Defendants' approvals were not based on the best available science, and the monitoring and mitigation measures suggested in the MOA and MOA BO will not adequately protect the Moapa dace if adverse impacts are detected, because of the inherent time delay for groundwater systems to rebound even after pumping is ended.  This action seeks an order declaring that Defendants have failed to uphold the U.S. Constitution and mandatory duties under the ESA and NEPA, and setting aside the challenged actions.

# II.  JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (United States as Defendant), 2201 (declaratory judgment), 2202 (injunctive relief); 16 U.S.C. §§ 1540(c) and (g) (action arising under the ESA and citizen suit provision); and 5 U.S.C. §§ 701 through 706 (Administrative Procedures Act ("APA")).

4. Venue is properly vested in the District Court of Nevada pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e) because the alleged violations of law, and a substantial part of the events or omissions giving rise to these claims, and the property that is the subject of the action, occur in this district.

5. Plaintiff provided 60 days notice of intent to file this suit pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(2)(C), by letter to each Defendant dated and sent by certified mail and facsimile on February 10, 2009. Neither Defendant responded to the notice of intent to sue nor have the Defendants remedied the alleged violations. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201. For all claims, Plaintiff has exhausted all of the administrative remedies available.

## III. PARTIES

6. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit corporation with offices in California, Arizona, New Mexico, Alaska, Nevada, and Washington, D.C. The Center is actively involved in species and habitat protection issues throughout North America and the Pacific. The Center has over 42,000 members throughout the United States, including many members who reside in California and Nevada, and live, visit, or recreate in and near areas that serve as habitat for the Moapa dace. The Center's members and staff have educational, scientific, biological, aesthetic and spiritual interests in the survival and recovery of the Moapa dace. The Center, its members and staff have participated in efforts to protect and preserve the habitat essential to the continued survival of the Moapa dace and use areas where the species habitat is found.

7. Plaintiff's staff and members live, work, visit, and/or recreate in areas of Nevada that serve as Moapa dace habitat. They use areas containing habitat of the Moapa dace for recreational, scientific, aesthetic, educational and conservation purposes, including, but not limited to, hiking, aesthetic enjoyment, photography, nature study and wildlife observation. They intend to continue to do so on an ongoing basis in the future. Plaintiff's staff and members

derive recreational, aesthetic, scientific, education and conservation benefit and enjoyment from the continued existence of the Moapa dace in the wild.

8.   Plaintiff's staff and members believe that the health of the Moapa dace and preservation of its habitat is a critical indicator of the overall health of the ecosystem where the species is found.  Defendants' failure to adequately protect this endangered species and Defendants' actions in entering into the MOA and issuing a faulty Biological Opinion for the MOA violate the ESA and may lead to the extinction of the species in the wild, and to harm to its habitat.  The failure to adequately and lawfully protect the species as required under the ESA will deprive Plaintiff's members and staff of recreational, aesthetic, scientific, education, conservation and other benefits.

9.   Plaintiff's members and staff have been and continue to be actively involved in efforts to protect and restore the health of the habitat of the Moapa dace and support efforts to ensure its survival.  No administrative process or any other public process was provided by Defendants before making these decisions.  Plaintiff has engaged with various state and federal agencies in the past to urge increased protection for the Moapa dace and its habitat as well as for other imperiled species that may be affected by Defendants' decisions challenged herein.

10.   The above-described aesthetic, conservation, recreational, scientific, educational, and other interests of Plaintiff's staff and members have been, are being, and, unless the relief prayed for herein is granted, will continue to be adversely affected and irreparably injured by Defendants' approval of the MOA and issuance of  the BO that fail to meet the legal requirements and standards of the ESA.

11.   The injuries described above are actual, concrete injuries suffered by Plaintiff's staff and members.  These injuries are caused by Defendants' failure to uphold the ESA, NEPA, the U.S. Constitution and other laws in taking the challenged actions.  The relief sought herein would redress Plaintiff's injuries.  Plaintiff has no other adequate remedy at law.

12.   Defendant UNITED STATES FISH AND WILDLIFE SERVICE ("Service" or "FWS"), is the agency within the Department of the Interior that has been delegated the

responsibility of the Secretary of the Interior to consult with agencies regarding projects that may affect non-marine species listed under the ESA, including the self-consultation which resulted in the issuance of the challenged Biological Opinion.  The Service's Nevada Fish and Wildlife Office issued the Biological Opinion challenged herein is located in Reno, Nevada. The Service is also charged with management and protection of National Wildlife Refuge ("NWR") lands and property including the water rights that were affected by the Service's agreement to enter into the MOA challenged herein.

13.     Defendant KEN SALAZAR is the Secretary of the Interior ("the Secretary") and is the federal official in whom the ESA vests final responsibility for making decisions and promulgating regulations required by and in accordance with the ESA.   He is sued in his official capacity.

## IV.  FACTS

**A.  Legal Background**

*Property Clause of the U.S. Constitution*

14.     The Property Clause of the Constitution vests Congress with the sole authority to dispose of Federal property. U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.").  Federal property includes federal water rights. While the power to dispose of property can be expressly delegated by Congress, the power to dispose of water rights has not been delegated to the Secretary or FWS.  Indeed, to the contrary, pursuant to Public Water Reserve 107 ("PWR 107"), established by Executive Order in 1926, government agencies cannot authorize activities that will impair the public use of federal reserved water rights necessary to support the resources on public lands where they occur.  The purposes for which federal water rights may be reserved include the survival and recovery of wildlife and fish on public lands.  PWR 107 created a federal reserved water right in water flows that must be maintained to protect public water uses necessary to maintain endangered species such as the Moapa dace.  PWR 107 applies to reserve water that supports riparian areas, and to reserve water

that provides flow to adjacent creeks and isolated springs that are "nontributary" or which form the headwaters of streams.  Reserved waters covered by PWR 107 are to be protected from activities that will impair the public use.  PWR 107 also protects the public lands on which protected water sources exist and the surrounding ecosystem.

*The Endangered Species Act*

15.  *Purpose of the ESA.*  Among the purposes of the ESA are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . .." 16 U.S.C. § 1531(b).  To this end, Section 4 of the ESA requires that the Secretary protect such species by listing them as either "threatened" or "endangered," and by designating "critical habitat" for each listed threatened or endangered species at the time the species is listed.  16 U.S.C. § 1533.

16.  "Conserve" and "conservation," as defined in the ESA, "mean to use and the use of all methods and procedures necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary."  ESA § 3(3), 16 U.S.C. § 1532(3).  This definition of "conservation" is broader than mere survival; it also includes the recovery of species.  *Id.*

17.  *Listing of Species.*  The ESA requires the Secretary to issue regulations listing species as endangered or threatened based on the present or threatened destruction, modification, or curtailment of a species' habitat or range; over-utilization for commercial, recreational, scientific, or educational purposes; disease or predation; the inadequacy of existing regulatory mechanisms; or other natural or manmade factors affecting the species' continued existence.  16 U.S.C. § 1533(a)(1).  An endangered species is one "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).  The ESA requires that the Secretary make listing determinations "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).  Only if officially listed does a species receive the full protection of the ESA.  The ultimate goal of the law is to conserve and recover species so that they no longer

require the protections of the ESA.  16 U.S.C. §§ 1531(b), 1532(3).  The Secretary has delegated his authority under the ESA to FWS for terrestrial species and non-marine fish including the Moapa dace.

18. *Critical Habitat.*  Concurrently with listing a species as threatened or endangered, the Secretary must also designate the species' "critical habitat."  16 U.S.C. § 1533(b)(2).  "Critical habitat" is the area that contains the physical or biological features essential to the "conservation" of the species and which may require special protection or management considerations.  16 U.S.C. 1532(5)(A).  The ESA requires the Secretary to make critical habitat designations and amendments "on the basis of the best scientific data available . . .."  16 U.S.C. § 1533(b)(2).

19. *Recovery Plans.*  Section 4(f) of the ESA requires the Secretary to "develop and implement plans . . . for the conservation and survival of endangered species . . .."  16 U.S.C. §1533(f).  Recovery plans must include a description of site-specific management actions that may be necessary to achieve the conservation and survival of the species; objective, measurable criteria which, when met, would result in a determination that the species be removed from the list; and estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.  16 U.S.C. § 1533(f)(1).

20. *Duty to Conserve.*  Federal agencies have an affirmative duty to promote the conservation (*i.e.*, recovery) of threatened and endangered species.  ESA Section 2(c) provides that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act."  16 U.S.C. §1531(c)(1).  Section 7(a)(1) also establishes an affirmative duty to conserve.  16 U.S.C. § 1536(a)(1).  The duty to conserve applies equally to the Secretary of Interior and other agencies.

21. Prohibition against "take": ESA Section 9 and its implementing regulations prohibit any person from "taking" a threatened or endangered species.  16 U.S.C. § 1538(a)(1); 50 C.F.R. § 17.31.  A "person" includes private parties as well as local, state, and federal

agencies.   16 U.S.C. § 1532(13).   "Take" is defined broadly under ESA to include harming, harassing, trapping, capturing, wounding, or killing a protected species either directly or by degrading its habitat sufficiently to impair essential behavior patterns.   16 U.S.C. § 1532(19). The ESA not only bans the acts of parties directly causing a take, but also bans the acts of third parties whose acts bring about the taking.

22.     One exception to Section 9's take prohibitions is relevant here.   Pursuant to Section 7 federal agency may take listed species only in accordance with an "Incidental Take Statement." 16 U.S.C. § 1536(b)(4).   If the terms and conditions of the Incidental Take Statement are followed, the federal agency and any permittee are exempted from Section 9's take prohibitions.   16 U.S.C. § 1536(o)(2).   A lawful Incidental Take Statement must specify the impact of incidental takings on listed species by providing a specific numerical "take" number.   16 U.S.C. § 1536(b)(4)(i); 50 C.F.R. § 402.14(i)(1).

23.     *Duty to insure survival and recovery; duty to consult.*   Pursuant to Section 7(a)(2) of the ESA, all federal agencies must "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species . . . determined . . . to be critical . . .."   16 U.S.C. § 1536(a)(2).   To fulfill this mandate, the acting agency must prepare a biological assessment for the purpose of identifying all endangered or threatened species which are likely to be affected by the action, 16 U.S.C. § 1536(c)(1), and must consult with FWS whenever such actions "may affect" a listed species.   16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

24.     *Biological opinion.*   Consultation under Section 7(a)(2) results in the preparation of a Biological Opinion by FWS that determines if the proposed action is likely to jeopardize the continued existence of a listed species or destroy or adversely modify a species' critical habitat. The BO must include a summary of the information on which it is based and must adequately detail and assess how the action affects listed species and their critical habitats.   16 U.S.C. § 1536(b)(3).   Additionally, a BO that concludes that the agency action is not likely to jeopardize a

listed species or destroy or adversely modify its critical habitat must include an Incidental Take Statement ("ITS") that specifies the impact of any incidental taking, provides reasonable and prudent measures necessary to minimize such impacts, and sets forth terms and conditions that must be followed. 16 U.S.C. § 1536(b)(4). Where an agency action may affect a listed species, the absence of a valid BO means that the action agency has not fulfilled its duty to insure through consultation that its actions will neither jeopardize a listed species nor destroy or adversely modify the species' critical habitat. Agency action cannot proceed without a valid BO.

25. The BO must include an evaluation of the direct, indirect, and cumulative effects of the action on listed species. 16 U.S.C. § 1536(a)(2); 50 CFR §§ 402.02, 402.12, 402.14(d), 402.14(g)(3). In addition to effects of other federal actions, "cumulative effects" include "effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02.

26. Throughout its analysis, the BO must utilize the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. §402.14(d). FWS must consider all the relevant factors and articulate a rational connection between the facts and its ultimate conclusion.

27. *Prohibition on Commitment of Resources.* Section 7(d) of the ESA, 16 U.S.C. § 1536(d), provides that once a federal agency initiates consultation on an action under the ESA, the agency "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section." The purpose of Section 7(d) is to maintain the status quo pending the completion of interagency consultation. Section 7(d) prohibitions remain in effect throughout the consultation period and until the federal agency has satisfied its obligations under Section 7(a)(2) that the action will not result in jeopardy to the species or adverse modification of its critical habitat. Whenever consultation is initiated or re-initiated the prohibitions of Section 7(d) apply.

*National Environmental Policy Act*

28. *Purpose of NEPA.* The purpose of NEPA is to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. NEPA effectuates this objective by requiring that federal agencies: (1) take a "hard look" at the environmental consequences of their actions before these actions occur by ensuring that the agency carefully considers detailed information concerning significant environmental impacts; and (2) make the relevant information available to the public so that it may also play a role in both the decision-making process and the implementation of that decision. *See, e.g.*, 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.1.

29. *Environmental Impact Statement.* NEPA and the regulations promulgated thereunder by the Council on Environmental Quality ("CEQ") require that all federal agencies, including the FWS, must prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1501.4.

30. An EIS must provide a detailed statement of: (1) the environmental impact of the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed actions; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332(2)(C).

*National Wildlife Refuge System Improvement Act*

31. The National Wildlife Refuge System Improvement Act states that the FWS "shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless [FWS] has determined that use is a compatible use." 16 U.S.C. § 668(dd)(d)(3)(A)(i). "Compatible use" includes only a use that "will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." 16 U.S.C. § 668ee(1).

32.

**B. The Endangered Moapa Dace and its Habitat**

33.     The Moapa dace is in the unique position of being the only species in its entire genus.  A small fish, the dace at most grows to 4.7 inches in length and can be identified by a black spot on the base of its tail, coloring that is normally olive-yellow and a white belly, and small embedded scales which creates a distinctive leathery appearance.

34.     The Moapa dace is endemic to the upper Muddy River and its tributary thermal springs in the Warm Springs Area in southeastern Nevada.  The Warm Springs area encompasses ten thermal spring provinces, which form the headwaters of the Muddy River.

35.      The Moapa dace can only survive in warm water, their ideal temperature being around 84-86° Fahrenheit, while the coolest temperature they can withstand is around 74° Fahrenheit.  The Moapa dace's need for warm water effectively limits their habitat range, with cooler water acting as a barrier to their greater dispersal, thus presenting the dace with numerous risks to their continued viability, and making the preservation of what little habitat the dace has left all the more essential.

36.     Threats to the survival of the Moapa dace include predation, food competition from non-native fish species, new diseases and parasites brought by invasive fish species, and most notably, destruction of its habitat, including from groundwater withdrawals.  At present the groundwater pumping approved under the Muddy River MOA and BO presents an imminent threat to the endangered Moapa dace and its habitat.

37.     In 1967, due to then-increasing threats to its habitat, the Moapa dace was federally listed as an endangered species, 32 Fed. Reg. 4001 (March 11, 1967), and has been protected under the ESA since its in 1973.    The FWS gave the Moapa dace a recovery priority of 1 (1 being the highest priority ranking).  In 1996, the FWS adopted the Recovery Plan for the Rare Aquatic Species of the Muddy River Ecosystem ("Recovery Plan") that includes the Moapa dace.  Critical habitat has not been designated for the Moapa dace.

38.     On September 10, 1979, the Moapa Valley National Wildlife Refuge was designated "under the authority of the Endangered Species Act of 1969, as amended, to secure

habitat for the endangered Moapa dace. The Refuge is located on 106 acres in northeastern Clark County."). 67 Fed. Reg. 54,229 (August 21, 2002).

39.     As FWS admits in the BO at issue, the proposed groundwater pumping will directly contribute to a decline in the Moapa dace's habitat. Since the MOA was signed and the BO was issued, the Moapa dace population has already declined. Despite this, the FWS has failed to fulfill its duties under the ESA to adequately protect the Moapa dace.

### C. Project Background

*Muddy River Memorandum of Agreement*

40.     In January, 2006, the FWS issued the *Intra-Service Programmatic Biological Opinion for the Proposed Muddy River Memorandum of Agreement Regarding the Groundwater Withdrawal of 16,100 Acre-Feet per Year from the Regional Carbonate Aquifer in Coyote Spring Valley and California Wash Basins, and Establish Conservation Measures for the Moapa Dace, Clark County, Nevada* ("BO") and then signed the Muddy River Memorandum of Agreement ("MOA"). In signing the Muddy River MOA regarding groundwater withdrawals from the Coyote Springs Valley and California Wash Basins area, the FWS agreed not to assert the federal water rights to oppose groundwater withdrawals of up to 16,100 acre-feet per year ("afy")[1] of groundwater from multiple wells in the Coyote Springs Valley and California Wash Basins. The agreement allows the extraction of groundwater and depletion of groundwater resources that will lead to a reduction in flow and impair the recorded/certified Federal water rights for the National Wildlife Refuge. The water extraction allowed under the MOA will also cause significant adverse effects to essential Moapa dace habitat and its survival. The Service was aware of these adverse effects in 2006 when it entered into the MOA and since that time additional scientific evidence confirms that the impacts will be significant.

---

[1] An acre-foot is the quantity of water that would cover one acre to a depth of one foot, or about 325,851.4 gallons.

41.     After pumping of a significant amount of additional groundwater began in 2006, up to 4,500 afy at the Coyote Springs site, the water levels in the springs declined and the Moapa dace population declined significantly. This new information regarding the impacts to the springs and the status of the Moapa dace was not evaluated by the FWS through the consultation process in order to ensure against jeopardy.

42.     Plaintiff is informed and believes and based thereon alleges that as early as August, 2010, pumping will be markedly increased and a two-year pumping period will commence as part of so-called "test" to determine the impacts of pumping 16,100 afy and whether additional groundwater could be pumped from the basin in the future.   Specifically, pumping of at least 50% of the 16,100 afy of groundwater for a period of two-years will commence in August, 2010, and pumping may reach as high as 13,000 afy during this two-year period.

43.     FWS holds valid rights to at least 3.5 cubic feet per second ("cfs") of flow for the benefit of the refuge.[2]   FWS entered into the MOA and agreed not to assert injury to water rights until flows at the Warm Springs West gauge fall to 2.7 cfs.  Thus, FWS ceded at minimum 0.8 cfs, or more than 22 percent of its water rights in the MOA.

44.     The Improvement Act states that the FWS "shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless [FWS] has determined that use is a compatible use." 16 U.S.C. § 668(dd)(d)(3)(A)(i). "Compatible use" includes only a use that "will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." 16 U.S.C. § 668ee(1).

45.     The BO for the MOA acknowledges that the proposed groundwater pumping will cause further declines in groundwater within habitat for the endangered Moapa dace.  Since some pumping began in 2006, the Moapa dace population has in fact declined.

---

[2] One cubic foot per second over a one year period is equivalent to approximately 724 acre feet per year.

# V. GENERAL ALLEGATIONS

## A. Violations of the Endangered Species Act Regarding the Muddy River MOA and Biological Opinion

46.     In the BO for the Muddy River MOA, the Service has failed to provide an adequate level of protection of habitat for the Moapa dace.  The BO fails to adequately disclose and analyze the full weight of the project's impacts to the Moapa dace and other species.

47.     Because the groundwater withdrawal associated with the MOA will have a direct and severe impact on Moapa dace, in approving the MOA, the Service has violated their ESA mandated duty under Section 7(a)(2) to insure against jeopardizing the continued existence of a listed species.

48.     Because the BO acknowledges that the proposed groundwater withdrawal will have a direct and severe impact on listed species, the FWS has failed to uphold its duty under the ESA to conserve the species; meaning that it must both protect the species from extinction, and take measures to restore the species so that it can be removed from the endangered/threatened species list. 16 U.S.C. § 1531(b), ESA § 3(3), 16 U.S.C. § 1532(3).

49.     The MOA BO does not provide sufficient information on which FWS's conclusions are based and does not adequately detail and assess how the action affects the Moapa dace and its essential habitat. 16 U.S.C. § 1536(b)(3).

50.     The MOA BO provides inadequate protection for the Moapa dace.  Thus, the FWS and the Secretary have violated their ESA Section 2(c) affirmative duty to conserve these species, and have refused to use their authorities to further the purpose of the ESA and species conservation for both the Moapa dace. 16 U.S.C. §1531(c)(1); 16 U.S.C. § 1536(a)(1).

51.     The MOA BO does not address how the project will impact or impede the recovery of the listed species affected by the project as they are required to under the ESA.

52.     The FWS failed to address consistency with and implement the recovery and conservation measures laid out in the Recovery Plans for the Moapa dace.  FWS' failure and refusal to implement the conservation measures outlined in the Recovery Plans or any other

measures that would insure the survival and recovery of the species' is a violation of its obligations under the ESA.

53.     Throughout its analysis, a BO must utilize the "best scientific and commercial data available."  16 U.S.C. § 1536(a)(2); 50 C.F.R. §402.14(d).  FWS must consider all the relevant factors and articulate a rational connection between the facts and its ultimate conclusion. FWS also failed to take into account best available science and data in reaching its conclusions regarding impacts to listed species.

54.     This includes, but is not limited to, the Service's refusal to take into account the latest information regarding the actual population count of Moapa dace, numerous scientific studies examining the devastating impact groundwater withdrawal has on the Muddy River ecosystem, and the latest scientific evidence which shows that climate change due to global warming is likely to reduce inflow and recharge to the aquifers which support to the Muddy River ecosystem.

55.     The Service has failed to identify the correct action area and, therefore, the agency could not adequately evaluate the cumulative effects of these actions in any of the MOA BO.

56.     The MOA BO features an incomplete and inadequate description and analysis of cumulative impacts as required by the ESA.  50 C.F.R. § 402.14(g)(3).

57.     By repeatedly deferring the analysis of the indirect and cumulative effects until future review of other site-specific projects and relying on an incorrect action area, the FWS failed to perform a full and adequate analysis of cumulative impacts as required by the ESA.

58.     The FWS has violated their ESA Section 7(b)(4) duty to issue an incidental take statement ("ITS") with each biological opinion for animal species that specifies the amount and extent of incidental take authorized to the action agency.  The Service has failed to provide such a take number or a sufficient alternative method of measuring take.

59.     The Service must also issue an ITS that specifies reasonable and prudent measures necessary to minimize such impacts; the Service has again violated the ESA by failing to issue adequate mitigation measures.

60.     Many of the conservation and mitigation measures identified in the MOA BO are overly broad or vague, uncertain to actually occur, or themselves present potential negative consequences for the Moapa dace.

61.     The Service failed to ensure against jeopardy through consultation and therefore must re-initiate consultation, when it does so the prohibitions of Section 7(d) of the ESA will apply and prohibit the Service from making any irreversible and irretrievable commitment of resources until it meets all of its obligations under the ESA.

62.     The MOA BO is wholly inadequate for protecting the Moapa dace.  The FWS has failed to uphold its non-discretionary duties to properly conserve and recover the Moapa dace, and protect them from jeopardy.

**B. Violations of the National Environmental Policy Act**

63.     FWS also failed to initiate a NEPA review process prior to approving the MOA in violation of law.  The MOA is clearly a major federal action that triggered NEPA review and the requirement that an EIS be prepared, because it has significant effects on a listed species and its habitat and impacts federal water rights.  FWS' failure to provide for public review and comment, an alternatives analysis as well as a detailed analysis of the direct, indirect and cumulative impacts of the MOA violated both the letter and spirit of NEPA.

**C. Violations of the National Wildlife Refuge System Improvement Act**

64.     FWS also failed to undertake a compatibility determination and provide for public review and comment on these issues before approving the MOA in violation of the National Wildlife Refuge System Improvement Act.  The Improvement Act states that the FWS "shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless [FWS] has determined that use is a compatible use." 16 U.S.C. § 668(dd)(d)(3)(A)(i). "Compatible use" includes only a use that "will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." 16 U.S.C. § 668ee(1). FWS has unlawfully agreed to allow groundwater pumping that will adversely effect the survival of the Moapa dace within the Moapa Valley National Wildlife Refuge and other resources in the

refuge system thus permitting a use of refuge property that is incompatible with the purpose for which the refuge was created.

**D. Violations of the Property Clause of the U.S. Constitution**

65.     The Property Clause of the Constitution vests Congress with the sole authority to dispose of Federal property. U.S. Const. art. IV, § 3, cl. 2.

66.      Federal property includes federal water rights. By the terms of the MOA, the Service agreed not to assert injury to water rights until flows at the Warm Springs West gauge fall to 2.7 cfs, despite the fact that the United States holds valid water rights to at least 3.5 cfs and thus through the MOA the Service unlawfully ceded federal water rights exceeding its lawful powers.

67.     The MOA represents an unlawful attempt by the Service to dispose of federal property, without due process of law.

**VI.  CLAIMS FOR RELIEF**

68.     For each of the Claims in this Complaint, the Center incorporates by reference each and every allegation set forth in this Complaint as if set out in full below.

**First Claim for Relief**
**(For Violations of the Property Clause of the U.S. Constitution**
**By Approving and Entering into the MOA)**

69.     The Property Clause of the Constitution vests Congress with the sole authority to dispose of Federal property. U.S. Const. art. IV, § 3, cl. 2.

70.      Federal property includes federal water rights. By the terms of the MOA, the Service agreed not to assert injury to water rights until flows at the Warm Springs West gauge fall to 2.7 cfs, despite the fact that the United States holds valid water rights to at least 3.5 cfs and thus through the MOA the Service unlawfully ceded federal water rights exceeding its lawful powers.

71.     The MOA represents an unlawful attempt by the Service to dispose of federal property without approval of Congress, and has therefore acted in a matter that is arbitrary, capricious, and not in accordance with law. *See* 5 U.S.C. §§ 701-706.

### Second Claim for Relief
### (For Violations of NEPA by Failing to Undertake NEPA Review for the MOA)

72.     The activities authorized under the MOA will result in significant direct, indirect, and cumulative impacts to listed species and water rights, and constitute federal action for which an EIS or EA are required.

73.     Defendants failed to undertake any NEPA review before approving the MOA.

74.     Therefore, Defendants violated their non-discretionary duties by failing to undertake NEPA review for the MOA, and have therefore acted in a matter that is arbitrary, capricious, and not in accordance with law. *See* 5 U.S.C. §§ 701-706.

### Third Claim for Relief
### (For Violations of Section 7 of the ESA by Failing to Insure Against Jeopardy through Consultation for the MOA )

75.     The FWS is violating Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and its implementing regulations as set forth at 50 C.F.R. §§ 402.10 and 402.16 *et seq*., by failing to ensure that its actions  do not jeopardize the Moapa dace.  FWS failed to insure against jeopardy of the Moapa dace in agreeing to cede water rights and facilitate the withdrawal of massive amounts of groundwater, which will have a direct impact on the viability of the Moapa dace and impact its essential springs habitat.  These violations are subject to judicial review under 16 U.S.C. § 1540(g).  FWS has also failed to re-initiate consultation to ensure against jeopardy in the face of new information and changed circumstances regarding the status of the Moapa dace and impacts to its habitat.

76.     For each of the above reasons, and others, Defendants failed to perform their non-discretionary duties as required by the ESA.  ESA § 11(g), 16 U.S.C. § 1540(g).

77.     In addition, the conclusions in the MOA BO were not based on the best available science, as required by the ESA, 16 U.S.C. § 1536(a)(2).  The MOA BO also failed to adequately analyze the impacts in the context of other threats to the Moapa dace including the cumulative effects as required by ESA and its implementing regulations. *See* 50 C.F.R. § 402.14.   Further, the MOA BO fails to provide for the recovery of the Moapa dace as required by the ESA and relies on unknown, unproven, and ineffective "reasonable and prudent measures" as mitigation for the proposed project's effects on the Moapa dace and as a result fails to ensure against jeopardy for the Moapa dace.

78.     For each of the above reasons, and others, FWS' issuance of and reliance on the MOA Biological Opinion violated the Endangered Species Act. 16 U.S.C. §§ 1531 *et seq.,* and FWS has therefore acted in a matter that is arbitrary, capricious, and not in accordance with law. 5 U.S.C. §§ 701-706**.**

## Fourth Claim for Relief
### (For Violations of the National Wildlife Refuge System Improvement Act)

79.     The National Wildlife Refuge System Improvement Act states that the FWS "shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless [FWS] has determined that use is a compatible use." 16 U.S.C. § 668(dd)(d)(3)(A)(i). "Compatible use" includes only a use that "will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." 16 U.S.C. § 668ee(1).

80.     The Service failed to undertake a compatibility determination required by law and failed to provide for public review and comment on these issues before approving the MOA in violation of the National Wildlife Refuge System Improvement Act.  FWS has unlawfully agreed to allow groundwater pumping that will adversely effect the survival of the Moapa dace within the Moapa Valley National Wildlife Refuge and other resources in the refuge system thus permitting a use of refuge property that is incompatible with the purpose for which the refuge was created.

81.     For each of the above reasons, and others, Defendants violated and failed to perform their duties as required by the National Wildlife Refuge System Improvement Act, and so have withheld agency actions required by law and have acted in a manner that is arbitrary, capricious, and not in accordance with law.  *See* 5 U.S.C. §§ 701-706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment providing the following relief:

1.      Adjudge and declare that Defendants violated the Property Clause of the U.S. Constitution by entering into the Muddy River Memorandum of Agreement and failing to protect property rights in water expressly reserved for the Moapa Valley National Wildlife Refuge for the benefit of the endangered Moapa dace.

2.      Adjudge and declare that Defendants' approval of the Muddy River Memorandum of Agreement without undertaking any environmental review violated the National Environmental Policy Act.

3.      Adjudge and declare that Defendants violated the Endangered Species Act by failing to ensure against jeopardy in approving the Muddy River Memorandum of Agreement.

4.      Adjudge and declare that Defendants' issuance of the Biological Opinion for the Muddy River Memorandum of Agreement violated the Endangered Species Act and its implementing regulations.

5.      Adjudge and declare that Defendants violated the National Wildlife Refuge System Improvement Act by failing to make the required compatibility determination before entering into the MOA and thereby permitting a use of refuge water rights that will undermine the purpose for which the refuge was established.

6.      Set aside Defendants' approval of the Muddy River MOA and Order Defendants to withdraw from that agreement.

7.      Set aside the Biological Opinion for the Muddy River Memorandum of Agreement.

8.      Order Defendants, through a permanent injunction, to halt all activities related to the Muddy River Memorandum of Agreement.

9.      Award Plaintiff its fees, costs, expenses and disbursements, including reasonable attorneys' fees as provided by the ESA, 16 U.S.C. § 1540(g)(4), and/or the Equal Access to Justice Act, 28 U.S.C. § 2412; and

10.      Grant the Plaintiff such additional and further relief as the court deems just and proper.

Respectfully submitted,

Date:  August 23, 2010              ___/s/Julie Cavanaugh-Bill_____
                                                    Julie Cavanaugh-Bill (NV. Bar No. 11533)
                                                    Attorney & Counselor at Law
                                                    Cavanaugh-Bill Law Offices, LLC
                                                    Henderson Bank Building
                                                    401 Railroad Street, Suite 307
                                                    Elko, Nevada 89801
                                                    TEL: (775) 753-4357
                                                    FAX: (775) 753-4360
                                                    julie@cblawoffices.org

                                                    John Buse (CA Bar No. 163156), *Pro Hac Vice to be filed*
                                                    Lisa T. Belenky (CA Bar No. 203225), *Pro Hac Vice to be filed*
                                                    CENTER FOR BIOLOGICAL DIVERSITY
                                                    351 California Street, Suite 600
                                                    San Francisco, CA 94104
                                                    Telephone: (415) 436-9682 x 307
                                                    Facsimile: (415) 436-9683
                                                    jbuse@biologicaldiversity.org
                                                    lbelenky@biologicaldiversity.org

                                                    Matt Kenna (CO Bar No. 22159), *Pro Hac Vice to be filed*
                                                    679 E. 2nd Ave., Suite 11B
                                                    Durango, CO 81301
                                                    Phone: (970) 385-6941
                                                    Fax: (970) 692-2570
                                                    matt@kenna.net

                                                    *(will comply with LR IA 10-2 within 45 days)*

*Attorneys for Plaintiff*