1

2

3

4
**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

5

6

7   CENTER FOR BIOLOGICAL DIVERSITY,    )        3:10-cv-00521-ECR-WGC
                                        )
8         Plaintiff,                    )
                                        )
9   vs.                                 )        **Order**
                                        )
10  U.S. FISH AND WILDLIFE SERVICE,     )
    and KEN SALAZAR, Secretary of the   )
11  Interior,                           )
                                        )
12        Federal Defendants,           )
                                        )
13  and                                 )
                                        )
14  SOUTHERN NEVADA WATER AUTHORITY     )
    and COYOTE SPRINGS INVESTMENT,      )
15  LLC,                                )
                                        )
16        Defendant-Intervenors.        )
                                        )
17  _____   )

18        Plaintiff filed suit alleging violations of the Property

19  Clause, the National Environmental Policy Act ("NEPA"), the

20  Endangered Species Act ("ESA"), and the National Wildlife Refuge

21  System Improvement Act.  Now pending are a number of motions for

22  summary judgment filed by Plaintiff, the Federal Defendants, and the

23  Defendant-Intervenors.

24

25                          **I. Background**

26        **A. Factual Background**

27        The Moapa dace is a small thermophilic fish endemic to the

28  upper Muddy River, and particularly to the headwaters of the Warm

Springs Area, in southeastern Nevada. (Administrative Record ("AR")
15.) The Moapa dace was federally-listed as endangered under the
Endangered Species Preservation Act of 1966 on March 11, 1967 (32
Fed. Reg. 4001). (AR 14.) The United States Fish and Wildlife
Service ("FWS") assigned the Moapa dace the highest recovery
priority because: "(1) it is the only species within the genus
*Moapa*; (2) the high degree of threat to its continued existence; and
(3) the high potential for its recovery." (AR 14.) The 2005 survey
data indicate that there are approximately 1,300 fish throughout 5.6
miles of habitat in the upper Muddy River system. (AR 24.) Threats
to Moapa dace habitat include introductions of non-native fishes and
parasites; habitat loss from water diversions and impoundments;
increased threat of fire due to encroachment of non-native plant
species and reductions to surface spring-flows resulting from
groundwater development. (AR 28-29.)

The Moapa Valley National Wildlife Refuge ("MVNWR") is a 106-
acre area of springs and wetlands located in the Warm Springs Area
of the Upper Moapa Valley. (AR 17.) The MVNWR was established in
1979 for the protection of the Moapa dace. (AR 17-18.) The MVNWR
consists of three units encompassing the major spring groups: the
Pedersen Unit, Plummer Unit, and the Apcar Unit (upper Apcar). (AR
18.) Approximately ninety-five (95) percent of the total population
of Moapa dace occurs within one major tributary that includes 1.78
miles of spring complexes that emanate from the Pedersen, Plummer,
and Apcar (a.k.a. Jones) spring complexes on the MVNWR and their
tributaries. (AR 24.) As of the 2005 survey, twenty-eight (28)
percent of the Moapa dace population was located on the MVNWR and

2

fifty-five (55) percent occupied the Refuge Stream supplied by the spring complexes emanating from the MVNWR.  (AR 24.)

The United States, through the FWS, is the owner of the water right evidenced by Permit No. 56668; Certificate No. 15097 issued subject to the terms of Permit No. 56668.  (AR 1356-59.)  On August 15, 1991, the FWS filed with the State of Nevada an application for a permit to appropriate 3.5 cubic feet per second (cfs) of the public waters of the State of Nevada (the "FWS Water Right").  (AR 1357.)  The application is for a water flow for non-consumptive instream flow use for wildlife.  (AR 1357.)  The State Engineer approved the application and issued a Certificate of Appropriation of Water on January 22, 1999.  (AR 1356.)  The certificated date of priority of appropriation of the water right is August 15, 1991. (AR 1356.)

The Southern Nevada Water Authority ("SNWA"), Coyote Springs Investment LLC ("CSI"), the Moapa Band of Paiute Indians ("Tribe"), and the Moapa Valley Water District ("MVWD") all own permitted water rights having appropriation priorities senior to the FWS's August 15, 1991 water right. (AR 3617.) These entities, together with the FWS, are the signatory parties to the April 20, 2006 Memorandum of Agreement ("MOA") that is the subject of the action herein.  (AR 3616.)  The SNWA owns water rights to 9,000 acre feet per year (afy) appropriated in 1985-86.  (AR 1400-57.)  CSI owns water rights of 4,600 afy originally appropriated by Nevada Power Co. under Permit No. 46777.  (AR 11.)  The Tribe owns water rights to 2,500 afy appropriated in 1989 by Las Vegas Valley Water District.  (AR 8.)

The MVWD owns water rights to 5,800 afy appropriated in 1988.  (AR 1384-99.)

On March 8, 2002, the State Engineer issued Order No. 1169, staying applications for new groundwater rights in certain groundwater basins, including the Coyote Spring Valley basin, and ordering a study of the effect of pumpage of water rights which have already been issued.  (AR 2651.)   The State Engineer ordered that the study must cover a five-year minimum period during which at least fifty percent of the water rights currently permitted in the Coyote Springs Valley groundwater basin are pumped for at least two consecutive years.  (AR 2651.)  SNWA, CSI, and MVWD are among those ordered to participate in the study.  (AR 2651.)

On January 30, 2006, before entering into the MOA, FWS issued the Programmatic Biological Opinion ("BiOp") for the proposed MOA. (AR 1.)  The BiOp evaluated the execution of the MOA by the service. (AR 1.)  The FWS specifies that none of the activities included in the MOA will be implemented absent project or activity specific consultations.  (AR 1.)  The BiOp examines the withdrawal of up to 16,100 afy from the Coyote Spring Valley basin and its potential effects to the Moapa dace because the MOA contemplates future groundwater development and withdrawal up to that amount.  (AR 1.) The BiOp explains that the MOA was agreed to by the signatories to outline conservation actions that each party would complete in order to minimize potential impacts to the Moapa dace should water levels decline in the Muddy River system as a result of the cumulative withdrawal of 16,100 afy of groundwater.  (AR 11.)  Each of the proposed groundwater withdrawals will be the subject of other tiered

4

biological opinions prior to any such withdrawal occurring.  (AR 11.)  Any future groundwater pumping by private parties that are determined to affect or take Moapa dace may only legally occur under the authorization of a Habitat Conservation Plan section 10(a)(1)(B) and its associated incidental take permit to be issued by the FWS. (AR 61.)  After analyzing the proposed groundwater pump test and the proposed conservation measures contemplated in the MOA, the FWS concludes that the FWS becoming a signatory to the MOA "is not likely to jeopardize the continued existence of the endangered Moapa dace."  (AR 61.)  While the effects of the proposed pump test were analyzed in the BiOp and the FWS concludes that the withdrawal of 16,100 afy from the Coyote Spring Valley and California Wash is likely to adversely affect the Moapa dace, the FWS stated in the BiOp that "the proposed action of signing the MOA, in and of itself, does not result in the pumping of any groundwater."  (AR 62.)

In April 2006, CSI, FWS, MVWD, SNWA, and the Tribe entered into the MOA. (AR 3616.)  The MOA was agreed to by the signatories "to ensure that conservation actions were in place prior to potential impacts associated with the project's groundwater pumping."  (AR 6.) The MOA signatories agreed to various conservation measures including the establishment of a recovery implementation program, habitat restoration and recovery measures, protection of in-stream flows, and the establishment of a hydrologic review team to ensure accurate monitoring and data collection.  (AR 73-85.)  The FWS anticipates that the proposed conservation measures would provide additional flows that would increase thermal habitat and the reproductive potential of the Moapa dace in the Apcar and Refuge

streams, and reduce the potential for fire and restore the overall spawning and rearing habitat sufficient to sustain several hundred Moapa dace on the Apcar Unit of the MVNWR.  (AR 59.)  The FWS also expects that the additional funding provided by signatories of the MOA would assist in the restoration of habitat, the construction of fish barriers, and the removal of non-native fishes, which would provide more secure habitat should water flows decline.  (AR 59-60.)

In addition to other conservation measures outlined in the MOA, CSI agreed to record a conservation easement dedicating 460 afy of its water rights to the survival and recovery of the Moapa dace and its habitat.  (AR 3622.)  CSI also agreed to dedicate five percent of all water rights above 4,600 afy that CSI may in the future be entitled to withdraw from the Coyote Spring Valley basin or any water rights that CSI imports into and uses in the basin.  (AR 3622-23.)  The MOA also provides that provided that the other parties to the MOA comply with its terms, FWS "expressly agrees not to assert a claim of injury to the FWS Water Right" against the other signatories for pumping water for any diminution in flows at the Warm Springs West flume above 2.7 cfs.  (AR 3633.)

**B. Procedural Background**

On August 23, 2010, Center for Biological Diversity ("CBD" or Plaintiff) filed a complaint (#1) against the FWS and Ken Salazar (the "Federal Defendants"), alleging violations of the Property Clause, NEPA, ESA, and the National Wildlife Refuge System Improvement Act.  SNWA and CSI ("Defendant-Intervenors") filed motions to intervene (##10, 22) which were granted (##11, 34).

6

1    Now pending are motions for summary judgment filed by Plaintiff

2 (#57), the FWS and Salazar (#59), CSI (#61), and SNWA (#63).

3

4                          **II. Legal Standard**

5    Summary judgment allows courts to avoid unnecessary trials

6 where no material factual dispute exists.  <u>N.W. Motorcycle Ass'n v.</u>

7 <u>U.S. Dep't of Agric.</u>, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court

8 must view the evidence and the inferences arising therefrom in the

9 light most favorable to the nonmoving party, <u>Bagdadi v. Nazar</u>, 84

10 F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment

11 where no genuine issues of material fact remain in dispute and the

12 moving party is entitled to judgment as a matter of law.  FED. R.

13 CIV. P. 56(c).  Judgment as a matter of law is appropriate where

14 there is no legally sufficient evidentiary basis for a reasonable

15 jury to find for the nonmoving party.  FED. R. CIV. P. 50(a).  Where

16 reasonable minds could differ on the material facts at issue,

17 however, summary judgment should not be granted.  <u>Warren v. City of</u>

18 <u>Carlsbad</u>, 58 F.3d 439, 441 (9th Cir. 1995), <u>cert. denied</u>, 516 U.S.

19 1171(1996).

20    The moving party bears the burden of informing the court of the

21 basis for its motion, together with evidence demonstrating the

22 absence of any genuine issue of material fact.  <u>Celotex Corp. v.</u>

23 <u>Catrett</u>, 477 U.S. 317, 323 (1986).  Once the moving party has met

24 its burden, the party opposing the motion may not rest upon mere

25 allegations or denials in the pleadings, but must set forth specific

26 facts showing that there exists a genuine issue for trial.  <u>Anderson</u>

27 <u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  Although the

28                                    7

parties may submit evidence in an inadmissible form — namely, depositions, admissions, interrogatory answers, and affidavits — only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. FED. R. CIV. P. 56(c); Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir. 1988).

In deciding whether to grant summary judgment, a court must take three necessary steps: (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof. Anderson, 477 U.S. at 248. Summary judgment is not proper if material factual issues exist for trial. B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir. 1999). "As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Disputes over irrelevant or unnecessary facts should not be considered. Id. Where there is a complete failure of proof on an essential element of the nonmoving party's case, all other facts become immaterial, and the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 323. Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole. Id.

///

///

///

8

### III. Discussion

**A. Property Clause**

Defendants challenge Plaintiff's standing to maintain a claim for a violation of the Property Clause.  Specifically, Defendants argue that Plaintiff cannot establish the elements of causation and redressability required for Article III standing.  The constitutional minimum of standing requires (1) an injury-in-fact which is concrete, particularized, and actual or imminent; (2) causation; and (3) redressability.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).  "<u>Lujan</u> holds that '[t]he party invoking federal jurisdiction bears the burden of establishing [the standing] elements.'"  <u>Nuclear Info. and Res. Serv. v. Nuclear Regulatory Comm'n</u>, 457 F.3d 941, 951 (9th Cir. 2006) (citations omitted).  Plaintiff claims that Defendants violated the Property Clause of the United States Constitution by approving and entering into the MOA.  Defendants do not directly challenge that there may be a cognizable injury-in-fact due to Plaintiff's interest in protecting and preserving the Moapa dace, but challenge Plaintiff's assertion that the injury is caused by Defendants' actions of entering into the MOA, or that the Court can redress the injury.[1]

---

[1] A plaintiff may assert a procedural rather than a substantive injury.  <u>Nuclear Info</u>, 457 F.3d at 949.  In a procedural injury case, a plaintiff must allege that "(1) the [agency] violated certain procedural rules; (2) these rules protect [a plaintiff's] concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests."  <u>Id.</u>  In this case, Plaintiff asserts that the Federal Defendants erred in failing to prepare an EIS, which may be a cognizable procedural injury coupled with Plaintiff's interest in protecting the Moapa dace.  Plaintiff's NEPA and ESA challenges, however, are discussed in a separate section.

In order to show causation sufficient for Article III standing, a plaintiff must establish that the injury is "fairly traceable to the defendant's allegedly unlawful conduct." Lujan, 504 U.S. at 590 (citing Allen v. Wright, 468 U.S. 737, 751 (1984)). Defendants argue that the MOA itself did not authorize any pumping of water. The MOA sets forth the agreement of the parties to undertake certain conservation measures aimed at increasing the number of Moapa dace in the region, to be carried out alongside the pump test authorized and ordered by the State Engineer. The act of entering into the MOA does not cause injury to Plaintiff's interest in preserving the Moapa dace. Because the MOA does not order or authorize the pumping of water, Defendants argue that Plaintiff does not have standing to object to the MOA.

Plaintiff responds that in entering the MOA, the FWS agreed to give up a water right and therefore harmed the Moapa dace. The MOA provides that the FWS holds a Nevada State water right certificate for a flow rate of not less than 3.5 cfs for the maintenance of habitat of the Moapa dace. (AR 3617.) The MOA provides that FWS will not assert an injury to its Nevada State water right until flows reach 2.7 cfs or less. (AR 3633.) Defendants respond that the FWS Water Right is junior to the water rights of the other signatories involved in the pump test and the MOA, and therefore the FWS has no legal right to assert injury to the FWS Water Right from groundwater withdrawals identified in the MOA.

The Court agrees that Plaintiff has not shown that the elements of causation and redressability have been met in its challenge to the MOA. The MOA itself does not authorize any pumping, and

10

primarily concerns conservation measures designed to assist the Moapa dace, not harm them.  For example, the signatories pledge funding to restore the Moapa dace habitat and remove threats such as non-native tilapia, as well as dedicating portions of water rights to the survival and recovery of the Moapa dace. Plaintiff continually misconstrues the MOA as authorizing the groundwater pumping, an interpretation unsupported by the language of the MOA. For example, while Plaintiff concedes that measures in the MOA are likely to benefit the Moapa dace, Plaintiff argues that measures including funding for habitat restoration and eradication of non-native tilapia "do not address the direct loss of prime habitat that is likely to result from implementation of the MOA." (Pl's Reply at 21-22 (#66).)  Defendants have provided unrebutted evidence that the groundwater pumping itself is a consequence of the State Engineer's Order and not a result of the MOA. The State Engineer's Order 1169 provides that the parties should conduct a study in which at least fifty percent of the water rights currently permitted in the Coyote Springs Valley groundwater basin are pumped for at least two consecutive years.  (AR 2651.)  Plaintiff has not shown that in entering the MOA, the FWS authorized or approved the pump test, or that the FWS has any authority to do so.[2]

---

[2] In the BiOp, the FWS states that any future groundwater pumping analyzed in the BiOp that is determined to affect or take Moapa dace may only legally occur under the authorization of a Habitat Conservation Plan section 10(a)(1)(B) and its associated incidental take permit issued by the FWS.  (AR 61.)  The issuance of such a permit will involve a separate internal consultation to affirm that the ESA would not be violated.  (AR 61.)  This action does not target the issuance of such a permit.  Plaintiff merely challenges the MOA and its associated BiOp, and Plaintiff has failed to show that the MOA and the BiOp cause the alleged injury to the Moapa dace.

Plaintiff has only identified one provision in the MOA that appears potentially harmful to the Moapa dace, that is, the FWS's agreement not to assert injury to its water right.  In response to Defendants' argument that the FWS has no right to claim injury to the FWS Water Right because it is a junior right to the water rights involved in the pump test, Plaintiff refers to federal water rights the FWS allegedly acquired in 1979 and 1983, which Plaintiff claims were impaired by the MOA.  However, the Court finds no language in the MOA to support such an impairment.  The MOA merely provides that the FWS will not assert an injury to the FWS Water Right, which is defined to be the Nevada State water right issued under Certificate No. 15097.  If the FWS holds other water rights as alleged by Plaintiff, those water rights were not the subject of the MOA and the FWS never gave up any of its rights to assert them.  For that reason, Plaintiff's claim that the FWS unlawfully ceded federal water rights in violation of the Property Clause is without merit.

Plaintiff does not challenge the State Engineer's order authorizing and requiring the pump test, which is the central injury Plaintiff complains of.  Instead, Plaintiff challenges FWS's BiOp finding that entering the MOA will result in no jeopardy to the Moapa dace, and the entering of the MOA itself.  Because Plaintiff has failed to show that those actions cause injury to the Moapa dace, we conclude that Plaintiff does not have standing to challenge those actions or to claim an injury to the Property Clause of the United States Constitution.  Even were we to find that Plaintiff has standing to assert this claim, Defendants have shown that there is no genuine issue of material fact concerning a violation of the

1  Property Clause as the MOA and the BiOp do not result in the FWS

2  "unlawfully ced[ing]" federal water rights as alleged in the

3  complaint.  (Compl. ¶ 66 (#1).)

4     **B. NEPA**

5     NEPA requires that an environmental impact statement ("EIS") be

6  issued for every "major Federal action[] significantly affecting the

7  quality of the human environment."  42 U.S.C. § 4332(c).  "An agency

8  undertaking a major federal action may first prepare an

9  environmental assessment ("EA") to determine whether an EIS is

10 necessary."  Grand Canyon Trust v. U.S. Bureau of Reclamation, —

11 F.3d ----, No. 11-16326, 2012 WL 3264499, at *2 (9th Cir. Aug. 13,

12 2012) (citing 40 C.F.R. § 1508.9).  An EIS is not required when a

13 proposed federal action "would not change the status quo."

14 Northcoast Environmental Ctr. v. Glickman, 136 F.3d 660, 668 (9th

15 Cir. 1998) (citations omitted).  Plaintiff challenges the FWS's

16 decision not to prepare an EA or an EIS before entering into the

17 MOA.

18    When an agency decides that a project does not require an EIS

19 without conducting an EA, the decision is reviewed under the

20 "reasonableness" standard.  High Sierra Hikers Ass'n v. Blackwell,

21 390 F.3d 630, 640 (9th Cir. 2004).  As discussed above, the FWS's

22 act of entering into the MOA itself does not authorize the pump test

23 or result in harm to the Moapa dace.  Plaintiff has not shown that

24 the FWS is conducting the pump test, or that it ordered the pump

25 test.  To the extent that Plaintiff is suggesting that the FWS

26 should have objected to the State Engineer's Order requiring the

27 pump test, the claim is non-justiciable as Plaintiff does not have

28                          13

1  standing to claim that Defendants have failed to undertake an

2  enforcement action.  See Salmon Spawning and Recovery Alliance v.

3  U.S. Customs and Border Protection, 550 F.3d 1121, 1128-29 (Fed.

4  Cir. 2008).  The action Plaintiff complains of must then be the

5  FWS's act of entering into the MOA, which is not fairly

6  characterized as a major federal action.  The MOA primarily concerns

7  conservation measures to protect the Moapa dace population.  We find

8  that the FWS's decision that signing the MOA did not require an EIS

9  or an EA because it was not a major federal action was not an

10  unreasonable one.

11     **C. ESA**

12     Plaintiff alleges that the FWS violated Section 7 of the ESA by

13  failing to conduct an adequate BiOP before entering into the MOA.

14  Specifically, Plaintiff claims that the BiOp relied on unknown,

15  unproven, and ineffective measures as mitigation for the effects on

16  the Moapa dace and as a result failed to ensure against jeopardy for

17  the Moapa dace. (Compl. ¶ 77 (#1).)

18     Section 7 of the ESA requires that federal agencies consult

19  with the FWS to insure that any action carried out by such agency is

20  not likely to jeopardize the continued existence of any endangered

21  species or threatened species.  16 U.S.C. § 1536(a)(2).  Formal

22  consultation results in a BiOp detailing how the agency action

23  affects the species or its critical habitat.  16 U.S.C. §

24  1536(b)(3)(A). In reviewing an agency decision involving scientific

25  and technical expertise, a court "must be highly deferential to the

26  judgment of the agency."  Nat'l Wildlife Fed'n v. U.S. Army corps of

27  Eng'rs, 384 F.3d 1163, 1174 (9th Cir. 2004).

28

The BiOp describes the MOA as an agreement "to outline specific conservation actions that each party would complete in order to minimize potential impacts to the Moapa dace" should water levels decline as a result of the pump test ordered by the State Engineer. (AR 11.)  The BiOp describes the proposed conservation measures and predicts the effects of these measures on the Moapa dace population. Ultimately, the BiOp concludes that FWS becoming a signatory to the MOA is not likely to jeopardize the continued existence of the Moapa dace because the MOA involves conservation measures that the FWS predicts will have a positive effect on the population of the Moapa dace. Plaintiff has not shown that the conservation measures described in the MOA are likely to harm the Moapa dace population, nor does it make that claim. Instead, Plaintiff repeatedly characterizes the MOA as authorizing the pump test and harming the Moapa dace.  Therefore, we conclude that the FWS has not violated the ESA in issuing the BiOp and concluding no jeopardy to the Moapa dace for its action of entering into the MOA.

**D. The National Wildlife Refuge System Improvement Act**

The National Wildlife System Administrative Improvement Act of provides that a new or expanded, renewed or extended existing use of a refuge requires a determination by the FWS that the use is compatible with the purposes of the refuge and the National Wildlife Refuge System.  16 U.S.C. § 668dd(d).  Plaintiff asserts that the FWS was required to undertake a compatibility determination before approving the MOA. (Compl. ¶ 80 (#1).) Specifically, Plaintiff argues that by agreeing not to assert injury to its water right until flows fall to 2.7 cfs, FWS "allowed a portion of the Refuge

water right and the associated Refuge spring complex to be used

'used' [sic] in connection with the groundwater pumping described in

the MOA."  (Pl's Mot. Summ. J. at 19 (#57).)  Because the pumping

occurs on lands outside the boundaries of the refuge, the MOA does

not grant a use of the refuge and the National Wildlife Refuge

Improvement Act does not apply.  Plaintiff's claim of a violation of

the Improvement Act fails as a matter of law.

### IV. Conclusion

Whether the action fails for lack of standing or for lack of merit, the action simply may not stand because Plaintiff challenges an agreement designed to aid, not harm, the Moapa dace. Plaintiff's action repeatedly challenges the FWS's involvement in the MOA, which is not the authority permitting and requiring the pumping of water from the Coyote Spring Valley basin.  For that reason, summary judgment shall be granted in favor of Defendants.

**IT IS, THEREFORE, HEREBY ORDERED** that Defendants' motions for summary judgment (##59, 61, 63) are **GRANTED** with respect to each of Plaintiff's claims.  Plaintiff's amended motion for summary judgment (#57) is **DENIED**.  Plaintiff's original motion for summary judgment (#52) is **DENIED** as moot.

The Clerk shall enter judgment accordingly.

DATED: September 27, 2012.

Edward C. Reed.

UNITED STATES DISTRICT JUDGE

16